*43
 
 Battle, J.
 

 At the time when the homicide with which the prisoner stands charged was committed, he is stated in the special verdict to have been a slave ; but at the time of the trial for the offence, we know, that by the operation of a public law he had become a free-man. Under these circumstances, it is contended hy the counsel for the prisoner, that his case is to be considered and determined upon the same principles as would be applicable to the case of one free-man killing another. This position is sought to be sustained by the analogy of the effect which the repeal of a statute has upon an offence which was committed while the statute was in force. In such case the offender cannot be tried, or if tried before the repeal no judgment can after-wards he pronounced against him, as has been decided at the present term in
 
 The State
 
 v.
 
 Nutt.
 
 The argument is, at first view, plausible and ingenious, but it will not bear the test of a critical examination. The offence, of which the prisoner is accused, has not been repealed by any statute, nor by the operation of any public law. It is now, as it was when it occurred, a high crime, and the only proper inquiry is, as to the degree of its criminality ; and that must, in the nature of things, be determined by the circumstances attendant upon its commission. To be murder, the crime must have been committed with malice prepense; and if the offender wore at the time actuated by that malice, we cannot see by what process that malice has been taken away by the change in his condition as a man. If, while a master were, for a proper cause, inflicting a moderate chastisement upon his apprentice, the latter were to kill him with a pistol or other deadly weapon, and were not to be tried for it until after he became of age, we presume he could not prevent a conviction of murder, by the allegation that, being then of age, it must be regarded as a legal provocation that his master struck him while he was under age. "We are not aware of any principle of criminal law by which
 
 *44
 
 such a defence can be sustained, and we think the analogy between that and the present case much stronger than the one insisted on by the prisoner’s counsel. Having decided that the prisoner must be held accountable according to the principles applicable to his status when the alleged crime was committed, it becomes our duty to ascertain what those principles are, and then apply them to the facts set forth in the special verdict.
 

 In performing this duty, our task is rendered comparatively easy by the full and able exposition of the subject, which is to be found in the arguments at the bar, and in the opinion of the court, in the case of the
 
 State
 
 v.
 
 Will,
 
 1 D. and B. 121. The essential principle clearly laid dowm and strongly enforced in that case is,
 
 “
 
 that while unconditional submission is the
 
 general
 
 duty of the slave, and unlimited power is, in general, the
 
 legal
 
 right of the master,”
 
 “
 
 it is certain the master has not the right to slay his slave, and it is equally certain that the slave has a right to defend himself against the unlawful attempt of his master to deprive him of life.” In the application of this principle to the facts of that case, the court held that the slave who had killed his temporary master while the latter was, as the slave had every reason to suppose, attempting to take his life, was guilty of manslaughter only, and not of murder..
 

 Let us see what will be the application of this principle to the facts stated in the special verdict now before us. The facts, to which this test must be applied, are those only which are distinctly set forth in the verdict, and such other facts as may be fairly and legally inferred from them. It appears then, that, at the time when the homicide was committed, the prisoner, who was then a slave, was guilty of an offence which, though it was neither an act of
 
 resistance
 
 nor
 
 rebellion,
 
 fully justified the deceased, who was his temporary master, in inflicting punishment upon him. The
 
 *45
 
 master, in the exercise of his discretion, had the right to select the mode of punishment, and therefore had the right to strike his slave: and it was the duty of the slave to submit. But the master had no right to- kill, and if he attempted to kill, or acted in such manner as apparently to endanger life, the slave was not bound to submit unresistingly to an attack which might end in his destruction. Here, then, we are brought to consider the character and attendant circumstances of the chastisement inflicted by the master upon his slave. The master is stated to have been an elderly man, but nothing is said as to his size or strength. “Elderly,” is defined by Webster to mean “ somewhat old ; advanced beyond middle age ; bordering on old age.” As the law will not, in the absence of testimony to that effect, presume that the man is sick, infirm, or a cripple, we must assume, upon the special verdict, that the deceased possessed the ordinary vigor of a man of the medium size, past middle age, but not yet arived at old age. The instrument he used is described to have been a heavy hickory stick, three feet long, three inches thick at the larger end, and tapering off to one and a half inches thick at the smaller end. The prisoner was a young man
 
 “
 
 just grown ;” and the jury find that the stick, while in his hand, was a deadly weapon. We think that such a bludgeon was equally so in the hands of the deceased. While the prisoner was in an act of disobedience, the deceased advanced upon him, threatening “ to mash his mouth,” if he repeated certain offensive words which he had just uttered. The words were repeated, and the deceased struck the prisoner two blows on the head with the stick, when the latter wrenched it from his hands, and struck him one fatal blow, and then fled.
 

 It is a fair legal inference from this account of the transaction, which we take from the special verdict, that the blows given and received by the parties to the contest, fol-
 
 *46
 
 ed each other in rapid succession; and such we have no doubt was the fact. The Attorney General assumes, in bis argument, that the blows struck by the deceased were slight. The other facts do not justify the inference. The deceased was provoked, and justly provoked, by the combined disobedience and insolence of the prisoner. The threat of mashing the prisoner’s mouth showed that he was angry. The quickly repeated blows evinced a purpose to inflict bodily hurt, and the weapon used would carry death, if wielded with sufficient force, as certainly as would a pistol or a bowie knife. Such were the circumstances at the moment when the prisoner snatched the stick from the hands of the deceased, and instantly killed him with it. Was this killing the result of malice, or of what we must adjudge to be a legal provocation ? That is the question, and it is one upon which we have deliberated with much anxiety, and have come to a conclusion with no little hesitation. That conclusion is, that the prisoner acted under a well grounded fear that his life was about to be taken, and struck the fatal blow from the irrepressible impulse of the instinct of self-preservation. The consequence is, that we must hold that his Honor, in the court below, committed no error in pronouncing judgment upon the special verdict, that the prisoner was not guilty of murder, but was guilty of the felonious killing and slaying the deceased. In support of this judgment, we think that the case of the
 
 State
 
 v.
 
 Will,
 
 herein before referred to, is a full and direct authority. Of
 
 Will’s
 
 case, it may be observed however, that in the earlier part of the transaction, which led to the fatal result, the attack upon the slave was of a more deadly character than was exhibited in the beginning of the contest in the present case ; but, at the moment when the fatal blow was struck, there was less apparent cause for the slave to fear that death was then to be inflicted in the former than in the latter case. But as in each case it may be seen that
 
 *47
 
 the slave was impelled, to kill his temporary master, in defence of his own life, the same principle must apply to both, varying though they do in some of their circumstances.
 

 Per Curiam. Judgment upon the special verdict that the prisoner is
 
 not
 
 guilty of the murder wherewith he stands charged, but is guilty of the felonious slaying and killing of William Duncan.